HeNRY Gr. Smith, J.,
delivered the opinion of the Court.
On the 24th of May, 1864, Graham was a loyal citizen of the United States, domiciled in the State of *624 New ’ York; and Merrill and Cliffe were loyal citizens of tbe United States, haying their domicil in Williamson County, in Tennessee. On that day the parties, Graham on the one side, and Merrill and Cliffe on the other, entered into articles of partnership to engage in the business of buying and selling cotton. The place where the partners contemplated and agreed to buy cotton, was in that • portion of the State of Tennessee, within the military lines of, and held in firm occupation by, the National army. Cotton so bought, the articles stipulated, should be sent to, and sold in, the city of New York. At the time of making the contract, Graham had a license or permit from “the proper officer of the Government of the United States,” to engage in the contemplated trade, and so informed Merrill and Cliffe. It was contemplated and agreed that the trade should be carried on “in strict conformity with the laws and regulations of the United States regulating commercial intercourse,” between the loyal and insurrectionary States. Graham furnished Merrill and Cliffe large sums of money, and they bought and shipped to him.- much cotton, the proceeds of sales of which, fell largely short of the money furnished.
The articles stipulated that Graham was to have one half the net profits, and to bear one half the losses; and Merrill and Cliffe were to have one half the net profits and bear one half the losses.
Such is a brief outline of the substance of the bill of complaint; enough to enable to be understood the questions discussed and decided.
•At the time of the making of the contract, the *625 enemy relation did not subsist between tbe parties; and therefore, they had the capacity to contract together, and their contract is not void by reason of enemy relation.
The National army had firm occupation of the country of the residence of Merrill and Cliffe. Such occupation established the dominion and Government of the United States over that country, and restored the inhabitants to the relation of citizens of the United States. The previous enemy relation between the parties to the contract, was thus ended, and their incapacity to contract with each other, by reason of their previous enemy relation, was also ended: 2 Wallace, 277; 6 Wallace, 531.
It is another question, whether tbe subject matter of the contract was lawful; a contract for commercial intercourse between a loyal State and a part of an insurrectionary State. If such trade was unlawful, the contract was illegal and void. Generally commercial intercourse between the loyal and disloyal States during the war of the rebellion, was unlawful. It was so made by the Act of Congress, of July 18, 1861, (12 Statutes at Large, 251,) and by the several proclamations of the President, in conformity with the Act; and also, probably by the laws of war. But, though generally prohibited as to all the insurrection-ary States, exceptions were authorized by the Act of Congress, and the proclamations of the President. Under the proclamations of August 16, 1861, (12 Statutes at Large, 1262,) unrestricted trade was authorized between the loyal States and such parts of the insur-rectionary States, as, “from time to time, should be *626 occupied and controlled by the National forces engaged in the dispersion of the insurgents.” Trade, also, was authorized between the loyal States and the disloyal States, by virtue of license granted by the President, and through and under regulations and restrictions prescribed by the Secretary of the Treasury, and approved by the President. Such license was granted by the President, by order of date February 28, 1862, which recites: “Considering that the existing circumstances of the country allow a partial restoration of commercial intercourse between the inhabitants of those parts of the United States, heretofore declared to be in insurrection, and the citizens of the loyal States of the Union, and exercising the authority and discretion confided to me by the Act of Congress, approved July 18, 1861, entitled ‘An Act to provide for the collection of duties on imports, and for other purposes,’ I do hereby license and permit such commercial intercourse, in all cases within the rules and regulations which have been, or may be prescribed by the Secretary of the Treasury, for the conducting and carrying on of the same, on the inland waters and ways of the United States.”
Intercourse thus authorized and regulated, continued until March 81, 1863. On that day, the President issued a further proclamation in regard to commercial intercourse between the loyal and disloyal States. The change made by that proclamation was to prohibit the unrestricted trade between the loyal States and the parts of disloyal States held and occupied by the National forces, which was authorized by the original proc-; *627 lamation. Such parts of tbe disloyal States were placed on tbe same footing as to trade, as tbe residue and unoccupied parts of tbe disloyal States. Tbe whole insurrectionary country was placed in tbe same condition, as to commercial intercourse witb tbe loyal' States. All were prohibited, except under license granted by tbe President, “through tbe Secretary of tbe. Treasury,” and regulations prescribed by the Secretary of tbe Treasury and approved by tbe President. But trade, in conformity witb such license and regulations, was lawful in whatsoever part of tbe insurrectionary country it was carried on: 2 Wallace, 278.
Tbe contract between tbe parties here, was made after tbe proclamation of tbe President of March 31, 1863, and is therefore dependent, as to the validity of tbe trade agreed on, upon tbe condition of tbe law as it then was, by virtue of tbe Act of Congress and tbe proclamation last mentioned. Tbe fact that tbe trade contemplated was between a loyal State, and part of an insurrectionary State in tbe firm occupation of tbe National forces, does not seem to be of vital, if even of material consequence. Tbe military occupation of tbe country wherein tbe cotton was to be bought, does not appear to give tbe trade any lawful quality, other than it would have in a region of country not so occupied. It is thus apparent, that there was a trade which might be lawfully carried on between inhabitants of tbe insur-rectionary country and residents of tbe loyal States. Such trade tbe parties in this case agreed to engage in. It follows that their contract to engage in such trade was lawful.
*628 It was not necessary to the legality of the trade, that the party engaging in it should have a special license to himself by name, from the President himself, under his sign-manual. A fair construction of the Act of Congress of July 13, 1861, does not exact that the trade which the President, under the regulations of the Secretary of the Treasury, was authorized to license, should be carried on by special and individual licenses, under his sign-manual. And such was not the practice at the time. Nor was it the construction put upon the Act at the time by the President and Secretary of the Treasury, who were charged by the Act with the duty and authority to allow trade, that the license must be issued by the President, directly to the individual licensed, or by authority of the President granted by himself in each particular case, upon his discretion exercised in each particular case, as to the individual to whom the grant of license was to be made. The Act authorizes the President in his discretion to license and allow the trade. Nothing' in it exacts, as of necessity, that the discretion was not in any manner or to any extent delegable. On the coutrary, the fact that the trade license was to be conducted in pursuance of regulations made by the Secretary of the Treasury, indicates that it was not intended to restrict the trade to individual instances designated in each particular case by the President himself, but to allow a trade in some measure of more general character, in conformity with general regulations prescribed for its government. That was the construction put upon the Act by the President and Secretary. And in conformity with such construe *629 tion, persons embarked in the trade, and, indeed, whole communities, when brought within the dominion of the sovereign government by the military forces. A construction so made at the time, and by the chief functionaries charged with the execution of the Act of Congress, ought not now to be departed from, unless for very cogent reasons. Such reasons are ngt apparent to this Court.
The President repeatedly exercised his discretion, and granted license to the trade. This was done by the order of February 28, 1862, already recited. It was further done by his order of March 31, 1863, accompanying and approving the regulations of that date, issued by the Secretary of the Treasury. The order or license recites, “that it appears that a partial restoration of intercourse between the inhabitants of sundry places and sections heretofore declared in insurrection, and the citizens of the rest of the United States, will favorably affect the public interest, therefore, the President, exercising the discretion and authority confided to him by the Act of July 13, 1861, hereby doth license and permit such commercial intercourse between the citizens of the loyal States and the inhabitants of the insur-rectionary States, in the cases and under the restrictions described and expressed by the regulations of the Secretary of the Treasury, of even date with the order,” to-wit: March 31, 1863.
A license to trade with the enemy in time of war, is Said to be stricti juris. By this is meant, in its ordinary application, that the license granted to the person, is *630 to be construed strictly, as to the extent of tbe power granted to him by it; in respect to the manner in which he may exercise it; the objects in which he may trade; the person with whom he may deal; the times and circumstances in which he may exercise the power; the good faith on his part in his use of it; the inability to transfer it to others or enable others to trade under it; and many other circumstances touching the construction and exercise of the authority granted by the license. But we are not aware of any principle or authority which applies the like doctrine to the power of the sovereign or Commander-in-Chief of the Army and Navy, or to other public functionary, authorized by the public law or statutory law., to issue or grant license to trade with the enemy in time of war. In respect of the authority granted to the public functionary to authorize such trade, the ordinary principles of construction are properly applicable. And when the authorized officer of the government has -exercised the power, and the citizens of the Government have largely acted under the authority, confiding in the validity of its exercise, no good reason is obvious, but on the contrary, much reason is manifest why the citizens so confiding, shall not have illegality imputed to their transactions under it.
It is not to be doubted, that trade authorized and conducted under the license of the President, so granted, and in conformity with the regulations of the Secretary of the Treasury, is not to be deemed illegal.
Another question in the case may properly be disposed of, which appears to be involved in much per *631 plexity and uncertainty. Upon the filing of the bill, an attachment and injunction issued at the instance of the complainant, which have been levied upon or operate upon all the properties of the defendants, Merrill & Cliffe, not being properties belonging to the firm or clothed with any trust connecting them with the properties of the firm.
No ground for such attachment or injunction, is laid in the bill. It is claimed that the fact that the equity of the bill being a demand of purely equitable nature, upon which an action at law, or an original attachment will not lie, and upon which no judgment at law can be obtained, the Chancery Court has authority to attach for the purpose of securing the decree, any of the properties of the defendant. And this by virtue of section 4387 of the Code.
Motion is made in this Court to discharge the attachment and injunction. The complainants resist the motion; and for one cause of resistance, say the case is not so in this Court, as to give this Court cognizance of such motion or matter. The case is brought into this Court under section 3157 of the Code, upon decree of the Court below overruling the demurrer. Upon common law practice in Chancery, an appeal or writ of error does not lie upon such decree or order. The defendant must plead or answer, and go to final hearing before he can appeal or have writ of error. Such is the common law practice.
The opinion of the Court is, that the appeal upon order overruling defendant’s demurrer, removes the whole cause from the Court below, and brings the *632 whole cause into this Court. This is apparent, and manifestly for one reason, if no other, that if the opinion of the Court be, that the demurrer is well taken, the whole cause is here dismissed and ended, and without any return to the Chancery Court. The Supreme Court has possession and jurisdiction of the whole case, and power to deal with it by such orders as may be suitable and proper, according to the rules of proceeding in Chancery.
To understand the sec. 4287, it will be useful to advert to its origin, and the history of the law belonging to it. It is transferred to the Code, from the Act of October 18, 1832, chapter 2.
Until the year 1831, process of execution ran against the person of the judgment debtor. The capias ad satisfaciendum, might be had upon the judgment as well as the fieri facias-, execution against the body as well as against the goods and chattels, lands and tenements of the debtor. In that year the execution against the body was abolished, with few exceptions, and the execution against his properties only remained.
The fieri facias was leviable upon legal properties only; properties in which the defendant had the legal title.
The original attachment was also leviable, only upon legal properties, and also could be maintained only upon demands of legal nature. The foreign attachment in Chancery, as now practiced, was at that time, unknown. To reach choses in action or equitable properties, the process of garnishment might be had on the fieri facias, and on the foreign or original attach *633 ment, by which process of garnishment, personS1^idebt-ed to the defendant, could be reached and made to am" swer, and pay, and disclose. But the answer of the garnishee was conclusive, and could not be contradicted.
By the capias ad satisfaciendum, the defendant could be put. into imprisonment and kept confined un» til he chose to relieve himself by discovering on oath and delivering up to satisfy the judgment, his properties, including choses in action, stock and other equitable assets. Soon after the abolition of imprisonment for debt, the case of Ewin vs. Oldham, reported in 6 Yerger, 185, arose, in which it was decided in the Chancery Court, in March, 1862, that a bill in Chancery upon a judgment, execution and nulla bona, would not reach and subject to the payment of the debt, the choses in action, stock and other equitable assets of the debtor, unless upon the grounds of some fraud, or some trust; fraud in converting legal or other properties into equitable, for the purpose of hindering and defrauding creditors. See Ewing vs. Cantrell, Meigs’ Report, 373, and Meigs’ Digest, vol. 1, page 176. By virtue of this decision, and under the operations of the law abolishing imprisonment for debt, and the law as to the kind of estates leviable by fieri facias and foreign attachment, the practical effect and result was, that the debtor could substantially defy the creditor, by putting his properties into equitable estates.
To remedy this defect of the law, the Act of October 18, 1832, ch. 11, transferred into sec. 4287 of the Code, was enacted. The first section of the Act provided that choses in action, stock and other equitable *634 assets of the debtor, might be subjected in Chancery, by bill founded on judgment at law, fieri facias and return of nulla iona. The second section conferred in the Chancery Court, power to compel discovery of properties, and prevent transfer or payment, etc. The third section gave a lien upon the equitable estates of the debtor, by a registry of a memorandum of the judgment, within sixty days of its rendition, and filing the bill in Chancery, in ten days after return of the fieri facias unsatisfied. But this was not enough. There were cases when the creditor could not obtain judgment at law; as, for instance, when his demand was not of legal cognizance, and cases where a foreign attachment would not avail; as, for instance, where the debtor’s properties were equitable, and, therefore, not leviable; and also where the creditor’s demand was of an equitable and not legal nature.
'In cases of such kind, and perhaps in others, it was desirable and proper, to give the creditor a remedy, to enable him to ascertain his debt by reducing it to decree, and to have execution therein against the debtor, and by means of it to subject the properties of the debtor, legal or equitable. This was aimed to be provided for by the fourth section of the Act, which, transferred to ^the Code, is difficult to understand and construe. In itself it is obscure. The draftsman of it was not happy in the perspicuous expression of his me ning. But enough is apparent, in the light of the history appertaining to it, to enable us to give a satisfactory construction ’ to the extent needful to the present case. It is clear enough that the law intend *635 ed to give tbe creditor a remedy in Chancery, where, according to the then modes of proceeding, no remedy was accessible in the legal forum against the properties of the debtor, both legal and equitable. If the demand were equitable, no judgment at law could be had, nor by means of the foreign attachment of the kind then only authorized by the existing laws.
The Act intended to give the equitable creditor a remedy, by attachment, against the debtor, who stood in the condition authorizing his properties to be attached, as prescribed by the Act of 1794, C. 1. S., 19, 21, etc. The causes of attachment prescribed by that Act, and which continued to be the only causes until after the Act of 1832, were, where the debtor had removed, or was about to remove himself privately, out of the country, or so abscond and conceal himself that the ordinary process of law cannot be served upon him, or is not an inhabitant of the State, It is since 1882, that the causes of original attachments have been increased in number, and the remedies extended to Chancery, as well as at law; and the properties leviable, have been extended to the equitable as well as legal.
The remedy given by the Act of 1832, sec. 4, was a new remedy, and enacted to supply a defect in the existing law. The defect was, that the creditor whose demand was equitable, was unable to reach his debtor’s properties by judgment at law, execution nulla bona and bill; nor by foreign attachment at law. There was no defect in the case, where a party had cause of equitable jurisdiction, and a remedy according to the *636 customary modes of proceeding in Chancery, and a defendant within the jurisdiction of the Court, subject to personal service of process, and decree in the ordinary course. The mere fact, that the demand of the party was of an equitable nature, was not, of itself, a cause for special aid in Chancery, over and above that given to demands of a legal nature. No reason is assignable why an equitable creditor shall be allowed to impound his debtor’s properties, more than, or under circumstances not allowed to, a legal creditor. It has been held by high authority, (2 John. Ch. Rep., 144,) that a Court of Equity, proceeding according to the course of the common law, will not give aid by injunction or otherwise, ■ to a creditor who is pursuing his remedy at law, and has not obtained judgment against the debtor, on the ground that the debtor is fraudulently disposing of his property, and with intent to defraud the creditor. In such case, Chancery will not, unless upon jurisdiction granted by statute, impound the debtor’s property, to await and abide the expected judgment at law. Nor will Chancery, unless authorized by statutory law, entertain original jurisdiction in favor of a creditor at large, to impound or attach the property of the debtor, on the ground that the debtor is fraudulently disposing of, or has disposed fraudulently of, his property, to defeat his creditor. Apart from statutory authority, the creditor has to await the obtaining judgment at law, before he can have equitable assistance.
Undoubtedly, the equitable creditor, or the com *637 plainant in equity, whose demand is of an equitable nature, may have the aid of Chancery in the outset, or during the progress of the cause, to impound the properties of the debtor, upon laying a ground recognized or authorized by statute, for issuing an attachment.
In Gasquet et als. vs. Scott et als., 9 Yer. R., 250, the opinion of the Court states, that the intent of the fourth section of the Act of 1832, was not to authorize a bill in Chancery, to subject equitable properties without judgment at law, except in cases of absolute necessity. That case, Gasquet vs. Scott, was, where a non-resident creditor filed a bill against a non-resident debtor, and against the grantee of the latter, under a conveyance made by the debtor, to defraud his creditors. The Court held, that the properties conveyed to the fraudulent grantee could not be reached by the bill.
This has been changed by subsequent statute. The section 4, of the Act of 1832, applies to legal demands, as well as equitable demands. No one would contend, that a bill could be maintained on a legal.demand to impound and subject the debtor’s properties, where personal service of process on the defendant, was available by summons, or when the properties could be subjected by attachment at law. It is equally inadmissible to hold, that a bill could be maintained on' an equitable demand, where personal service of process could be had upon the defendant. To authorize the attachment and impounding of the properties, something more must be shown than the mere fact of the demand being legal or equitable.
*638 The impounding the debtor’s general properties in this case, by attachment or injunction, was inadvertent and not authorized by statute, sec. 4278, nor by the general principles of Chancery proceedings and power. The Court has the power to grant attachments and injunctions in regard to properties in the ordinary course of proceeding, when necessary or useful to obtain or secure its jurisdiction; and the inadvertent grant of such process by the Court, does not make the process void. But it is inadvertent to grant such process upon the mere ground that the demand of the complainant is of an equitable nature. It is proper, therefore, that the attachment and injunction be discharged.
Upon the contract, the parties are chargeable with the losses — Graham one half, and Merrill and Cliffe the other.
The decree of the Chancellor is affirmed so far as it overrules the demurrer; and the case is remanded for further proceeding in the Chancery Court, in conformity with this opinion.